UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA    )    DOCKET NO. 3:09-CR-60
                            )
        vs.                 )
                            )
RICARDO JAVIER ARELLANO,    )
                            )
        Defendant.          )
_____)


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE MARTIN KARL REIDINGER
UNITED STATES DISTRICT COURT JUDGE
APRIL 7, 2010




APPEARANCES:

On Behalf of the Government:

    THOMAS A. O'MALLEY
    United States Attorney's Office
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina

On Behalf of the Defendant:

    CECILIA OSEGUERA
    Federal Public Defender's Office
    227 West Fourth Street, Suite 300
    Charlotte, North Carolina




        Cheryl A. Nuccio, RMR-CRR
          Official Court Reporter
        United States District Court
          Charlotte, North Carolina

<u>P R O C E E D I N G S</u>

THE COURT:  The next matter we have is the case of United States versus Ricardo Javier Arellano, which is before the court for sentencing of the defendant pursuant to his plea of guilty on three counts of armed bank robbery and aiding and abetting the same under 18, U.S.C., Section 2113(d) and Section 2, one of those also being under Section 2113(a), and another count of armed bank robbery, including forcing a person to accompany defendant without consent and aiding and abetting the same under 18, U.S.C., Section 2113(a), 2113(d), 2113(e), and Section 2.

Ms. Oseguera --

MS. OSEGUERA:  Good morning.

THE COURT:  -- is the defendant prepared to proceed?

MS. OSEGUERA:  Yes, Your Honor.  Good morning.

THE COURT:  Good morning to you.

Mr. O'Malley, is the government prepared to proceed?

MR. O'MALLEY:  Yes, Your Honor.

THE COURT:  At the outset here I note that there are no objections for either side to the presentence report or motions for departures or sentencing memoranda that have been submitted on behalf of either side that I -- that I'm aware of.

Ms. Oseguera, are there any such documents that you have submitted -- excuse me, there is the sentencing

Cheryl A. Nuccio, RMR-CRR (704)350-7494

memorandum that was submitted that I read this morning. That's why it's not on my form. But other than that -- I have read that -- anything else that I should have received and reviewed?

MS. OSEGUERA: Your Honor, I just received two additional letters from family members, but I'm not going to present those to the court. I'll just inform the court that I received those. But other than that, in the sentencing memo I did attach exhibits.

THE COURT: Right.

MS. OSEGUERA: So I do not have anything else to provide the court at this time.

THE COURT: And those exhibits were found here, including letters written on behalf of the defendant as well as a number of photographs and certificates and awards and things of that nature.

MS. OSEGUERA: That's correct, Your Honor. And we did not submit any objections to the presentence report.

THE COURT: Okay. Mr. O'Malley, was there anything else submitted on behalf of the government that I did not mention?

MR. O'MALLEY: No, Your Honor. But to advise the court -- and we responded to the court's questionnaire -- at least one of the victims does want to make a statement in the course of the proceedings.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1          THE COURT:  Okay.  Well, we will make sure that the

2  victims have an opportunity to do that.

3          At the outset of the hearing, there having been no

4  motions for departure, but just reviewing one thing that I

5  would like the parties to make sure that they address during

6  the course of this hearing is whether or not any departures

7  based on 5K2.4 for abduction or 5K2.6 regarding use of a

8  dangerous weapon would be applicable in this case.

9          With that, Mr. Arellano -- I hope I'm pronouncing

10  your name correctly.

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  Do you recall being before the

13  magistrate judge on or about the 27th of July of last year for

14  the purposes of entering a plea of guilty in this case?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  Do you remember being sworn in or placed

17  under oath at that time?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  Do you remember answering the questions

20  of the magistrate judge?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  Is it correct that at that time you

23  signed a plea inquiry form indicating that your answers were

24  true and correct at the time they were given?

25          THE DEFENDANT:  Yes, Your Honor.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1          THE COURT:  Were your answers, in fact, true and
2     correct when you answered the questions of the magistrate
3     judge?
4          THE DEFENDANT:  Yes, Your Honor.
5          THE COURT:  If I asked you all the same questions
6     here today, would your answers be the same?
7          THE DEFENDANT:  Yes, Your Honor.
8          THE COURT:  Ms. Oseguera, are you satisfied that
9     your client fully understood the questions that were posed to
10    him by the magistrate judge at the Rule 11 hearing?
11         MS. OSEGUERA:  I am, Your Honor.
12         THE COURT:  Are you satisfied that he has fully
13    understood the questions that I've asked him here today?
14         MS. OSEGUERA:  I am, Your Honor.
15         THE COURT:  Mr. Arellano, did you answer those
16    questions the way that you did and are you pleading guilty
17    because you did, in fact, commit the crime -- crimes with
18    which you are charged?
19         THE DEFENDANT:  Yes, Your Honor.
20         THE COURT:  Is your plea of guilty the result of any
21    force or threat or promise other than the promises set out in
22    your plea agreement?
23         THE DEFENDANT:  No, Your Honor.
24         THE COURT:  Are you pleading guilty voluntarily?
25         THE DEFENDANT:  Yes, Your Honor.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

1          THE COURT:  Now, in this case you're pleading guilty

2     pursuant to a plea agreement and in that plea agreement you

3     have agreed and the government has agreed to certain facts and

4     certain factors.  But under Rule 11(c)(1)(B) of the Federal

5     Rules of Criminal Procedure, I'm not required to accept those

6     facts or factors even though the government has agreed to

7     them.

8          Now, if I decline to accept any of those facts or

9     factors, you will not have the right to withdraw your plea.

10    Do you understand that?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  Is it still your plea to plead guilty in

13    this matter?

14         THE DEFENDANT:  Yes, Your Honor.

15         THE COURT:  Based upon the representations made to

16    the court and the answers given by the defendant at the Rule

17    11 hearing before the magistrate judge, the court finds,

18    concludes, and confirms that the defendant's plea is knowingly

19    and voluntarily made and that the defendant understands the

20    charges, potential penalties, and consequences of his plea.

21         Ms. Oseguera, does the defendant stipulate that

22    there is a factual basis to support his plea of guilty entered

23    in this case; and further, that the court may accept the

24    evidence as set forth in the presentence report as

25    establishing such factual basis?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1          MS. OSEGUERA:  So stipulated, Your Honor.

2          THE COURT:  Mr. O'Malley, does the government so

3    stipulate?

4          MR. O'MALLEY:  Yes, Your Honor.

5          THE COURT:  Based upon the stipulation of the

6    parties and the evidence as set forth in the presentence

7    report, which report was previously reviewed by the court, and

8    based upon the defendant's admission of guilt, the court

9    finds, concludes and confirms that there is a factual basis

10   for the defendant's plea.  And accordingly, the court confirms

11   the magistrate judge's acceptance of the defendant's guilty

12   plea and this court accepts the defendant's plea of guilty,

13   finds the defendant is guilty and enters thereon a verdict and

14   judgment of guilty.

15          Now, Mr. Arellano, there's a document that's been

16   prepared.  I'm holding up a copy of it here.  It has a caption

17   that says United States of America versus Ricardo Javier

18   Arellano, and it has a title that says Presentence

19   Investigation Report.  I see that Ms. Oseguera is showing you

20   a copy there at your table.

21          Have you seen that document before?

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  Have you had an opportunity to review it

24   with your attorney?

25          THE DEFENDANT:  Yes, Your Honor.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1          THE COURT:  Do you understand the contents of that

2    document?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  Ms. Oseguera, have you had an

5    opportunity to review the presentence report with

6    Mr. Arellano?

7          MS. OSEGUERA:  I have, Your Honor.

8          THE COURT:  Are you satisfied that Mr. Arellano

9    understands the contents of the presentence report?

10         MS. OSEGUERA:  I am, Your Honor.

11         THE COURT:  Thank you, Mr. Arellano.  You may take

12   your seat.

13         THE DEFENDANT:  Thank you.

14         THE COURT:  Now, there were no objections or at

15   least no unresolved objections to the presentence report.  Are

16   there any other issues regarding the presentence report that

17   we need to address?

18         MS. OSEGUERA:  No, Your Honor, from the defense.

19         THE COURT:  Anything for the government?

20         MR. O'MALLEY:  No, Your Honor.

21         THE COURT:  Then the court will accept the

22   presentence report as written and based thereon will find that

23   the correct -- find and conclude that the correct and

24   appropriate total offense level to apply in this case is a 31

25   and that the correct and appropriate criminal history category

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    to apply in this case is a I.

2              Ms. Oseguera, does the defendant stipulate as to

3    that total offense level and criminal history category?

4              MS. OSEGUERA:  So stipulated, Your Honor.

5              THE COURT:  Mr. O'Malley, does the government agree?

6              MR. O'MALLEY:  Yes, Your Honor.

7              THE COURT:  Based on a total offense level of 31 and

8    a criminal history category of I, the court concludes that the

9    guidelines range applicable in this case is 108 to 135 months.

10             Ms. Oseguera, did I calculate that correctly?

11             MS. OSEGUERA:  That's correct, Your Honor.

12             THE COURT:  Do you agree, Mr. O'Malley?

13             MR. O'MALLEY:  Your Honor, because there's a

14   mandatory minimum on one of the offenses, although it may be

15   108 to 135 on those which do not have a statutory minimum, the

16   range overall is 120 to 135 because of the statutory minimum.

17             THE COURT:  You are correct, under 5G1.1 that would

18   make the range 120 to 135 rather than 108 to 135.  Do you

19   agree with that, Ms. Oseguera?

20             MS. OSEGUERA:  Yes, Your Honor.

21             THE COURT:  Are there any other issues that need to

22   be addressed other than the question of the appropriate

23   sentence to impose and then allowing an opportunity for victim

24   statements?

25             MS. OSEGUERA:  Not from the defense, Your Honor.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1              MR. O'MALLEY:  No, Your Honor.

2              THE COURT:  I think before we move on to the final

3     arguments regarding sentence, I want to move on to the victim

4     statements.  I see that there are a number of people in the

5     gallery here.  Mr. O'Malley had mentioned earlier that there

6     is at least one victim here who is wanting to address the

7     court.  Are there any others -- let me ask it this way.  Are

8     there any people there in the gallery who are victims of this

9     particular crime who are wanting to address the court?  If so,

10    please raise your hand so I know how many people I'm going to

11    deal with.

12             Okay.  Just the one.  If you would please come

13    forward at this time.

14             Was there a second one?

15             Okay.  If both of you would please come forward.

16             Is there anyone else who is here in the gallery who

17    is a victim of this crime who is wanting to address the court?

18             MR. O'MALLEY:  I will speak for one of them, Your

19    Honor.  She didn't want to address the court personally, but

20    she's conveyed to me what she would like me to convey to the

21    court.

22             THE COURT:  Okay.  Well, let's start with that one,

23    Mr. O'Malley.  If you could address -- okay.  I see that there

24    is a third person coming forward.  Please come forward and

25    we'll -- I will hear from each of you.

                 Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    MR. O'MALLEY:  I think she's now decided she will

2 make a statement so I will let her speak for herself.

3    THE COURT:  Okay.  That's the one you were going to

4 speak -- okay.

5    If you would please come up one at a time, stand

6 there next to Mr. O'Malley, state your name, and then you may

7 address the court.

8    MS. BAKER:  My name is Julie Baker.  I'm an employee

9 of First Citizens Bank.  I've been there 19 years now.  And

10 Your Honor, there is nothing that could have prepared me for

11 the morning of December 1st, 2008.  The only thing that has

12 kept me going that day is my faith, and Ricardo that morning

13 asked me a lot about it.

14    Several weeks prior to the robbery, I had been

15 convicted that I could not quote scripture as I could when I

16 was a teenager, so I had begin to -- me and my children had

17 begin to memorize scripture.  And the very first one was

18 Jeremiah 29:11.  For I know the plans I have for you, says the

19 Lord.  I have good plans for you; not plans to hurt you.  I

20 will give you hope and a good future.

21    That was the very first verse that we learned, and

22 that is what I held on to that morning.

23    When he came into my home at a quarter to 6:00 in

24 the morning with a gun pointed at my daughter, at me, and then

25 my young son, Your Honor, there is nothing that could have

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  prepared us for that.  I thought what have we done to make
2  someone mad that would do this to us.  I was relieved when I
3  found out that it was about the bank, about money; that it
4  wasn't us personally, Your Honor.

5         But I wanted -- I want to tell you that I hold no
6  malice or hatred in my heart toward him because that being the
7  Monday after Thanksgiving, I was just filled with the greatest
8  sense of thanksgiving that my family was okay.  That we were
9  alive.  That no one was hurt that day.  My coworkers were
10 okay.

11        My children, their lives has forever been changed,
12 especially for Shelby.  My son is not able to be here.  He had
13 knee surgery last week.  But Shelby's life has forever been
14 changed, Your Honor.  She has this untrust of people, as you
15 can imagine after being through an attack like that.  She
16 finds it hard to trust people.  But I will say that she is
17 more aware of her surroundings when she goes out.  She knows
18 what to look for.  She's very level headed, Your Honor.  But
19 yet her life will never be the same.  She has had to seek some
20 counseling.

21        But, Your Honor, other than their safety, the
22 biggest fear I have in still being a bank employee is that
23 this type of robbery not gain popularity, and I just ask you
24 that the sentence would convey to others that would think
25 about this type of robbery, that that would be a deterrent to

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

1 others.  Even though I -- like I said, I don't hold hatred in

2 my heart toward him because I'm just so thankful that no one

3 was hurt.  But Your Honor, I just ask you that the sentence be

4 that someone else that would be thinking about that type of

5 crime, that it would be a deterrent to them.

6              I thank you for this opportunity, Your Honor.

7              THE COURT:  Thank you, Ms. Baker.

8              MS. McLEOD:  Good morning, Your Honor.

9              THE COURT:  Just a second.

10              Okay.  Please state your name and then you may

11 address the court.

12              MS. McLEOD:  My name is Monique McLeod.  I am also a

13 First Citizen employee.  I was there with Ms. Baker that

14 particular morning.  And I really don't have much to say other

15 than the fact that I just want to stand as a representation of

16 the emotional damage of -- I can't really stand in

17 representation of the physical -- the physical, internal

18 damage that this type of crime caused.  But not only has it

19 devastated my world, my life, but it also has changed the

20 dynamic of my family, my attitude towards work.

21              I am still a bank employee.  And there is just a

22 level of, I think, unnecessary fear.  When you accept that

23 type of position, you already prepare yourself that things

24 like this could possibly happen; but when it's manifested in

25 your life, there is a level of fear and anxiety that you have

1  to deal with on a daily basis because you never know, you

2  know, like Ms. Baker said, you never know what to expect.

3         And again, I don't hold any malice in my heart

4  towards the defendant.  However, I just think that it needs to

5  be known that it's not just an act.  It's not just something

6  that you decide to do and it stops there.  It is an act that

7  keeps -- it's an internal and an ongoing effect that it has,

8  and I think that that is what my desire is that is represented

9  here today.  That it did not just end that day.  That it is

10 something that the victims will have to deal with for the rest

11 of their lives, whether -- no matter how they deal with it,

12 it's something that we have to deal with forever and that's

13 what I ask be represented here today.  Thank you.

14         THE COURT:  Okay.  Thank you very much.

15         Ma'am, please come forward.  Please state your name

16 and then you may address the court, ma'am.

17         MS. JAMES:  My name is Marlena James.  I was a bank

18 manager at Bank of America.  And I do have malice in my heart.

19 I don't forgive you.  I really despise you.

20         THE COURT:  Okay.  Ms. James, this is your

21 opportunity to address the court --

22         MS. JAMES:  Okay.

23         THE COURT:  -- not the defendant.  So keep your

24 comments directed to me.

25         MS. JAMES:  Okay.  Sir, he used to work at the bank

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   so he knew what he was doing.  And he has faces of previous

2   associates and coworkers who could have experienced this.  And

3   I don't know why he did it.  I really don't.  I'm a woman of

4   faith and I have tried to pray for him and I can't.  I cannot.

5   I know he has a mother and a father, just like I do.  And he

6   is a person.  And it just bothers me to know how selfish he

7   was and how violent he was.  All for a couple of dollars.

8           And I love my job -- I used to a lot.  I used to be

9   so enthusiastic, which is why I was there early.  And he had

10  his little plan so well thought out.  And it's impacted my

11  life in so many ways.  So many ways.

12          But I just don't -- I don't have any empathy or

13  remorse -- I don't know what the word is -- for him.  I just

14  don't have it.  And I'm glad that he's going to jail.

15          And that's all I have to say.  Thank you.

16          THE COURT:  Thank you, Ms. James.

17          Are there any other people here who are victims of

18  this crime who are wanting to address the court?

19          (No response.)

20          THE COURT:  Okay.  Seeing none, we will proceed.

21          Ms. Oseguera, I will hear from you as to what

22  sentence I should impose in this matter, and also I do want

23  you to specifically address the issues that I mentioned at the

24  beginning about whether 5K2.4 or 5K2.6 may apply in this case.

25          MS. OSEGUERA:  Your Honor, I would like to start

1  with addressing the sentencing guidelines 5K2.4 and 5K2.6
2  regarding the abduction and the use of a dangerous weapon.
3  They are not applicable in this case, Your Honor.  Mr. --
4  Ricardo pled to serious charges of bank robbery.  One of those
5  charges was count three, Your Honor, where he is actually
6  looking at a mandatory term of 120 months in custody for that
7  charge alone.  The statute takes into consideration Ricardo's
8  conduct, what he did to those victims as far as the kidnapping
9  goes, Your Honor.

10        And again, I'm not making excuses for Mr. Arellano's
11  conduct.  I just heard from Ms. Baker.  She's obviously just
12  extremely upset and traumatized by what occurred to her.  So
13  the -- any variance or upward departure based on the abduction
14  is not proper in this case.

15        I'd also like to address the use of a dangerous
16  weapon.  Initially the government charged 924(c) counts which
17  were using a firearm in relation to a crime of violence which
18  was the bank robbery.  Mr. Williams -- Mr. Nicks Williams and
19  I had discussed that, and unfortunately Mr. Williams is not
20  here today, but we did discuss that in detail.  The weapons,
21  although, again, to the bank employees appeared like real guns
22  or real weapons, they were not real guns.  During the
23  preliminary hearing, the special agent testified that at least
24  during the BB&T bank robbery on December -- on January 2nd of
25  '09, the gun fell apart and it broke into pieces.  So it was

1    not -- when I say gun, it was a toy or a replica of a gun.  It

2    wasn't an actual weapon that was designed to expel a

3    projectile.

4              Again, Your Honor, the statute takes those -- the

5    statute and the amount of time that Mr. Arellano is looking at

6    takes those two guidelines into consideration.

7              And further, Your Honor, the government was provided

8    a copy of the presentence report as well and did not raise the

9    objection.

10             And thirdly, Your Honor, I would like to go on and

11   let Your Honor know that the 3553(a) factors in the statute

12   and a sentence within that guideline range of 120 to 135

13   months is a sufficient sentence and will justify all the

14   factors outlined in 35 -- 18, United States Code, 3553.  If I

15   may proceed with that, Your Honor.

16             THE COURT:  You may.

17             MS. OSEGUERA:  I cannot sit here and make excuses

18   for Ricardo.  I, as an attorney practicing eight years now,

19   have never seen anything like this.  Ricardo was a star

20   athlete.  His family provided me with his medals.  And those

21   are also, Your Honor, I included photos and exhibits in the

22   sentencing memorandum.  He was a star track athlete.  He was a

23   star cross country athlete.  He played soccer.  He started

24   playing soccer at Sun Valley Middle School.  He was awarded

25   most valuable player.  He received decent grades all

1 throughout middle school and high school. He was a member of

2 the ROTC. I have -- I couldn't submit those as exhibits, but

3 I have his badges that he received for that. I have

4 everything that he wore on his ROTC uniform.

5         THE COURT: And you've submitted photographs of

6 these as --

7         MS. OSEGUERA: That's correct, Your Honor.

8         THE COURT: -- exhibits to your sentencing

9 memorandum.

10         MS. OSEGUERA: That's correct, Your Honor. There is

11 an actual picture of his ROTC uniform.

12         He also, Your Honor, was a member of the Police

13 Explorers. He wanted to and he still wants to become a member

14 of law enforcement. He routinely volunteered. He volunteered

15 at elementary schools. He volunteered playing bingo with

16 elderly families -- elderly individuals.

17         So there is even times, Your Honor -- and again, I

18 submitted these as exhibits. He appeared in the local

19 newspaper on numerous occasions. Just excellent photographs

20 of him prevailing at soccer, at cross country. I mean, I have

21 one that I did not submit, Your Honor, when he was in middle

22 school still and he looks like a little boy similar to what he

23 looks like right now.

24         I submitted as well, Your Honor, letters from family

25 members just describing how they were in shock as to what --

1    how on earth could this individual -- how on earth could
2    Ricardo, their family, friend, do this type of conduct.
3    Family members and friends describe him as loving, as caring.
4    The father of Ricardo's former ex-girlfriend in high school
5    really liked Ricardo and he went on family vacations with
6    them.

7              A team mate submitted a letter and was just shocked
8    because he never -- never knew Ricardo to behave in that
9    manner, never saw this coming.

10             And so I appear here today in court, Your Honor, and
11   I even asked myself what on earth happened here.  He had
12   scholarships.  He wanted to play at Appalachian State.  There
13   was other numerous colleges.  Unfortunately, that required
14   some money even though there was some scholarships available
15   and he didn't have the money to pay for that.

16             So college was put on hold for Ricardo and he
17   decided to work and become an adult.  And the vigors of this
18   young adulthood he could not handle.  He absolutely could not
19   handle.  He wasn't in high school anymore.  He wasn't an
20   athlete.  He wasn't being taken care of by family and friends
21   anymore.  He had to go out into the real world.  He was 18,
22   19, and 20, and work and support himself and do things adults
23   do and young adults do.

24             And what occurred, Your Honor, is he moved in with
25   his brother Mario and he just -- he couldn't pay the bills.

                  Cheryl A. Nuccio, RMR-CRR (704)350-7494

He lost his job at Bank of America on his own fault. No
excuses there. He lost his job at Bank of America. And
engaged in the conduct. Decided he was going to rob these
banks. Again, making no excuses for this.

Your Honor, Ricardo does not have a criminal
history. He stands here before you with no criminal history.
He was an outstanding member of society. He was a loving boy.
He still is. And he just -- he wanted to do right until this
happened. Something came over him and he became a monster.
The person sitting by me today, Your Honor, is not the same
person that committed those bank robberies.

He's not going to commit bank robberies in the
future. He and I have had numerous discussions concerning his
actions and what led him to do this. He routinely cries and
can't finish his sentences because he's so remorseful. I have
letters that he wrote to the actual victims in this case. I
received those in the mail yesterday so I did not submit them
as sentencing exhibits, but I would like for him to read them
to Your Honor and I would like for the victims -- there may be
more victims back there that did not speak. But I would like
for Ms. Baker, Ms. Howard-McLeod, and Ms. James to listen to
Ricardo because he is truly remorseful for what he did, Your
Honor. Truly remorseful.

So Your Honor, when you look at all the 3553(a)
factors, a sentence within the guideline range is sufficient

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   to deter future conduct.  He's looking at ten plus years, Your

2   Honor.  It's sufficient to show the rest of the world that,

3   hey, you cannot do this.

4         This is -- this is still a little boy, Your Honor.

5   He's 23 years old.  He's going to jail for at least the next

6   ten years.  His -- his entire twenties where he should be in

7   college, he should be graduating from college is gone.  He's

8   going -- and not only, Your Honor, is he going to serve at

9   least a minimum of ten years in federal prison, he's going to

10  have to deal with this after he gets out of prison.  He has

11  multiple -- he will have and he has right now multiple

12  felonies on his record.  It's going to be very, very difficult

13  for him when he gets out of custody.

14        So I've also been in close contact with his family

15  members because Ricardo is capable of change.  He's capable of

16  rehabilitation.  He's one of my clients who has not said, oh,

17  get me the lowest sentence possible.  I'm afraid.  I don't

18  want to serve ten years.  He says give me my time.  Give me my

19  time.  I deserve it for what I did to these individuals.  I

20  deserve it for what I did to the children, to this woman, to

21  the family, to these people who have families who love them.

22  He says I deserve it.

23        My job as an attorney, though, is to ask the court

24  to be very fair, to be reasonable when you sentence Ricardo.

25  Because he is a changed person and the next ten years he will

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  have a lot of thinking, a lot of thoughts that he has.  He's

2  going to have to live with what he did to these people.  And

3  it's not only going to be the next ten years, it's going to be

4  for the rest of his life.  So he's not going to engage in the

5  conduct again, Your Honor.

6          I've spoken with his family members.  He has very,

7  very supportive family members.  They came through, they

8  provided me with all this documentation.  The family members

9  who are actually sitting in court are his father.  His brother

10 is also in court, Mario Arellano.  His uncle Ricardo Arellano

11 is in court.  His grandmother Norma Escobar is in court.  She

12 wrote a letter.  Indie Perada is also in court who is a

13 friend.  They all came to support their family member.  They,

14 too, are in the same shock.  They're all great members of the

15 community, working, very productive, and just cannot believe

16 that Ricardo got so desperate.  Didn't ask for help.  He just

17 became so desperate and decided to take matters into his own

18 hands instead of talking to his family members who love him

19 dearly and saying, look, I am desperate.  I need to do

20 something.  I need you to help me.  He didn't do that.

21         But now he's asking for help, Your Honor.  Ricardo

22 has informed me that he wants to participate in as many

23 programs at –– in the Bureau of Prisons as possible.  He

24 doesn't have a substance abuse problem.  Again, another factor

25 I would think would have contributed to this to support some

Cheryl A. Nuccio, RMR–CRR (704)350-7494

1   type of habit, et cetera.  Doesn't have a substance abuse

2   problem.  He is having some health problems with a seizure

3   disorder, but again, that's no excuse for the type of conduct

4   he engaged in.

5           So based on all those factors, Your Honor, those do

6   warrant a sentence within the guideline range because he is

7   going to serve a sufficient amount of time.  The variances or

8   the upward departures are absolutely not necessary because the

9   mandatory sentence here and the statutory -- the statute --

10  the federal statutes actually take into consideration his type

11  of conduct.

12          And I also note before I finish speaking that two of

13  the family members would also like to address the court and

14  they obviously know Ricardo a lot more than I do and might

15  give you a little insight into what type of person Ricardo is

16  before he committed these heinous offenses.  And if now is the

17  proper time, Your Honor...

18          THE COURT:  If they are going to address the court,

19  now would be the proper time.

20          MS. OSEGUERA:  Thank you.

21          THE COURT:  For the two family members, if you would

22  please come forward.  You may stand there next to Ms. Oseguera

23  and you may first state your name and then you may address.

24          MS. OSEGUERA:  Thank you, Your Honor.  This is

25  Ricardo's uncle.  It's Ricardo Arellano as well.

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

1          MR. RICARDO ARELLANO:  My name is Ricardo Arellano.

2    I am the uncle of Ricardo.  Currently work right now for a

3    nonprofit company.

4          And first of all, Your Honor, I want to -- on behalf

5    of my family, I want to deeply, deeply apologize to the

6    victims.  We're very, very sorry about what happened.

7          And pretty much, I mean, Cecilia has said a lot of

8    true things about Ricardo.  I mean, pretty much everything.  I

9    can't really -- I would like to add more things, but pretty

10   much that's boiled down to Ricardo.  That's him.

11         As I was saying, I work for a nonprofit organization

12   and we do good things for the neighborhood.  It's actually

13   called -- the company is actually called Neighborhood

14   Assistance Corporation of America.  Sometimes I think Ricardo

15   could actually be working for me there because he likes to

16   help people.  He's a great kid.  Like Cecilia said, we're

17   shocked about what has happened, what he committed.

18         And again, I'm not -- I'm not here to excuse

19   Ricardo.  You know, we're aware of what happened.  We just --

20   I just want -- on behalf of my family, want to ask for you to

21   be reasonable and to be as lenient as you can with Ricardo.

22         THE COURT:  Okay.  Thank you.

23         MR. MARIO ARELLANO:  Thank you very much for this

24   opportunity.

25         THE COURT:  Please state your name and then you may

                 Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    address the court.

2              MR. MARIO ARELLANO:  Mario Arellano.  I'm Ricardo's

3    older brother.

4              Just like my uncle said, I do want to apologize to

5    the victims.  I know maybe that my apology doesn't do

6    anything.  And one of the victims said they have a mother and

7    a father.  In our case our father is here.  Our mother is in

8    another country, third-world country where everything is just

9    worse than, you know, anywhere elsewhere.  We have to provide

10   also for her.  And our little brother is also over there.

11             Once again, I'm not excusing my brother.  What he

12   did was wrong.  And I'm sure he's -- he regrets everything he

13   did, all his actions.

14             And all I would like to say, you know, be as fair as

15   you can be.  You know, just take in consideration that he's --

16   like Cecilia says, he doesn't have a criminal record.  And he

17   definitely did emotional damage to the victims, you know, not

18   any physical or harm that will put them, you know, in a

19   wheelchair or situations like that.

20             But I do thank you for this opportunity.  And that's

21   all I would like to say.  Thank you so much.

22             THE COURT:  Thank you, Mr. Arellano.

23             MS. OSEGUERA:  Thank you, Your Honor.

24             And I believe my client would also like to address

25   the court.

              Cheryl A. Nuccio, RMR-CRR (704)350-7494

1          THE COURT:  Well, he will get that opportunity.

2          MS. OSEGUERA:  Thank you, Judge.

3          THE COURT:  But right now, Mr. O'Malley, what says

4     the government?

5          MR. O'MALLEY:  Your Honor, if I can first provide

6     some background of my participation in the case in regard to

7     this allocution.

8          First of all, I was not the prosecutor who either

9     indicted this case nor negotiated the plea.  I've reviewed the

10    indictment.  I've reviewed the plea agreement.  My

11    understanding of the agreement between the parties with

12    respect to sentencing in paragraph 7 is only that the

13    government would make the recommended one -- motion for

14    one-level reduction on top of the two which the defendant

15    already is entitled to for acceptance of responsibility.  And

16    there are no other restrictions on either party's comments to

17    the court with respect to seeking a sentence.

18         The -- and let me first then -- or next address the

19    court's question whether or not a departure under 5K2.4 for

20    abduction or 2.6 for dangerous weapon would be an appropriate

21    departure.  That's not something that, before I heard the

22    court today, I had an opportunity to brief, but I would say

23    this.  That my understanding of the guidelines, it would not

24    be an appropriate basis of departure if those factors are

25    taken into account initially in the guidelines score, and I

1    think that's been done by both -- the computation of the

2    guidelines account for both of those.

3           But that's not to say that if the court feels that

4    the sentencing range of 120 to a 135 months, that the court is

5    bound to sentence within that range.  Certainly the court is

6    aware that the court may depart for factors that are not taken

7    into account by the calculations, and I'm not identifying

8    these two.

9           Additionally, the court can always vary since the

10   guidelines are advisory only.  And so, if the court feels that

11   the sentencing range as presently computed is inadequate, the

12   court certainly can either find another basis to depart

13   because it's not taken into account or a variance because of

14   the facts and circumstances of the case.

15          Let me respond first to Ms. Oseguera's comments

16   about this being, you know, a bad mistake by this defendant.

17   We're not talking about a note job in a bank.  We're not

18   talking about somebody who lifted his shirt and pointed to a

19   gun.  We're not talking about one occasion.  There were six

20   robberies here of banks and businesses, by his confession, and

21   one attempted bank robbery.  So what the court is looking at

22   is a defendant who did it over and over and over and over and

23   over and over and over again.  He did it in the span of a few

24   months.  He did it in a way that put people in fear of their

25   lives.  Not just simply showing a gun; but as you heard from

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  Ms. Baker, going to her house at 6 o'clock in the morning, the
2  place where a person feels safest of all places, and accosting
3  not just her in her role as a bank employee, but her family,
4  her children.

5        Now, the gun counts were dismissed as part of the
6  plea.  There was no gun recovered.  The defendant claimed they
7  were fake.  There is one incident where parts fell apart.  But
8  I can tell the court that in my conversations with Ms. Baker,
9  they're still here if the court wishes to inquire, and
10 Ms. McLeod, the gun he had on that first robbery they believed
11 was real.  They believe it was real because it was metal.  And
12 they believe it was real because Ms. McLeod said that when she
13 was being forced to open up the vault, she heard the defendant
14 cock the gun as one would do a semi automatic and that's to
15 pull the slide back for the purpose of loading a round from
16 the magazine into the chamber for the purpose of expelling a
17 bullet upon the first pull of a trigger.

18       Now, the court need not find that this was a real
19 gun or not because the question the court should consider in
20 fashioning a sentence here is did these victims believe it was
21 a real gun?  And the evidence is they did.  They were in fear
22 of their life.

23       Another factor that was not charged in this case --
24 and if the court is looking for factors, I would say that, you
25 know, under 2B3.2, the extortion -- let's see.  Let me see if

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    I have the right section here. 2B3.1, excuse me, for the bank

2    robbery. Your Honor will notice that in 2B3.1, specific

3    offense characteristics, subparagraph (b)(3), it sets forth

4    various levels of increase for bodily injury. Anywhere from

5    two for bodily injury, four for serious bodily injury, six for

6    permanent or life threatening bodily injury. There is no

7    specific offense characteristic for the mental anguish these

8    people suffered. The mental anguish they had at that time.

9    Perhaps thinking not only in Ms. Baker's case that she might

10   lose her life, but her children might lose their life because

11   they were bound and kept at the home while she was being

12   forced in her own car, which was a carjacking, by the way, not

13   charged, being forced to go to the bank to open up the bank

14   vault. And her children were left bound and told that another

15   individual was sitting with them. There's no specific offense

16   characteristic for that kind of fear. There's no specific

17   offense characteristic for the mental anguish that continues

18   in their mind from that frightful event.

19          There's no specific offense characteristic for

20   Ms. McLeod who advised me after this she's now on medication

21   for high blood pressure and depression, but she's still got to

22   work and works at a bank. There's no specific offense

23   characteristic for that permanent mental harm to the victims.

24          And you've just heard from the victims with respect

25   to the first bank robbery and somebody from Bank of America.

Case 3:09-cr-00060-MR   Document 55   Filed 06/17/10   Page 29 of 48

1          There is no specific offense characteristic where

2    the abduction involves binding the victim's children and using

3    them as a leverage to commit the bank robbery.

4          And whether the court wishes to use those factors to

5    depart or vary in certain -- or to impose a sentence as a

6    variance, the court is free to do so.

7          This was -- these were a series of bank robberies

8    that took a lot of planning.  The defendant was a teller at

9    Bank of America for a five month period of time.  I don't know

10   the circumstances of why he was there only five months.  But

11   he used the knowledge not to get another job as a teller

12   somewhere, he used the knowledge to commit the bank robberies.

13   He surveilled the back employee to find out where she lived.

14   He kidnapped and accosted the kids.  Took her to the bank,

15   carjacked in her own car.  And then he didn't just want a few

16   thousand dollars.  He wanted all the money in the vault and

17   she didn't have the authority to open the vault by herself.

18   So he waited and that's when he accosted Ms. McLeod at

19   gunpoint as well.

20          And in each of the subsequent robberies, he showed

21   up to confront people, threaten them, bind them.  And he took

22   22,000 in the first robbery, 25,000 -- or 25,000 and change in

23   the first robbery, 22,000 and change in the second robbery.

24   So by January 14th he had about $47,000 in tax free cash from

25   committing these robberies.  What was his financial condition

1    then?  What did he owe money beyond the 47,000 in cash that he

2    had then?

3            He knew he could get away with it.  He thought he

4    had everything planned.  These people were gagged.  They were

5    bound.  He covered up the surveillance cameras, but he failed

6    to cover up the camera in the last of those robberies when he

7    got a hundred thousand dollars from the vault of the Bank of

8    America.  And only because of that mistake was he caught when

9    he was, a few days later.  And had it not been for that, he

10   would have continued committing these robberies.  Putting

11   other people in fear of their lives.  Other people in fear of

12   their coworkers' lives.

13           So, Your Honor, Ms. Oseguera is correct.  I mean,

14   I've been doing this for a long time.  This is one of the most

15   egregious series of bank robberies, putting so many people in

16   fear of their own lives, their children's lives, and their

17   coworkers' lives.  And that certainly, at the very least, is

18   deserving of a sentence at the top end of the guidelines.  And

19   if the court feels that's inadequate, it is certainly the

20   basis for a sentence of more than 135 months' imprisonment.

21   Thank you.

22           THE COURT:  Thank you.

23           Mr. Arellano, at this time you have an opportunity

24   to address the court and to tell me anything that you feel may

25   be of value for me to know before I impose sentence in your

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  case.

2          MS. OSEGUERA:  Your Honor, can I just make one brief

3  statement concerning Mr. Arellano.  Mr. Arellano was caught at

4  the bank and he immediately confessed.  They -- prior banks

5  had been robbed and I'm not sure if the government had

6  suspects, et cetera, but Ricardo described his conduct.  He

7  described everything he did and described all -- accepted

8  responsibility for the other bank robberies.  And I think the

9  agent can provide Your Honor with more information concerning

10  that.  But Ricardo definitely did not try to hide the fact

11  that, oh, hey, I just robbed this bank and that's it.  He

12  said, look, I'm going to get this off my chest.  I'm going to

13  tell you what else I've done.  And therefore, we have the

14  indictment with the additional bank robberies.  Thank you.

15          THE COURT:  Mr. Arellano, you may address the court

16  at this time.

17          THE DEFENDANT:  Your Honor, I just want to thank you

18  for this time.  It's hard for me to...

19          THE COURT:  Take your time.

20          THE DEFENDANT:  Your Honor, I can't imagine how much

21  pain that I caused all those people.  There's no excuse for

22  what I have done.  It's hard to see the evidence that shows a

23  different person than I was.  Sometimes I think it seems like

24  a dream, but that is me.

25          I'm not here to make any excuse, Your Honor.  What I

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    did, it was in the action of selfishness, hatefulness,

2    desperation of trying to help out someone that I love and yet

3    my actions were to do something good but -- I'm sorry, Your

4    Honor.  My intentions were good, but my actions were wrong.

5          And I just think about how I have a mother and a

6    father and, yeah, as Ms. Julie say, I entered her home and put

7    her life in danger, her kids in danger.  And anyone that knows

8    me knows how much I love kids and how much I wouldn't want to

9    harm anyone.  I just -- I just can't imagine what they're

10   going through, the difficult things that they're surrounding

11   their life has changed.

12         There's nothing that really can explain why I did

13   these things.  There's no excuse.  It was in a desperate time

14   that I didn't think.  That I didn't think before I did those

15   things I did.  Every day sometime I take a look at myself and

16   look behind what I did, but every day I tried to leave the

17   things in the past behind me and the struggle was ahead of me.

18         One of the things that shocked me the most is the --

19   all three lady, Ms. Julie, Ms. Monique, and Ms. Marlena, that

20   they all talked about faith, and that's something that I

21   didn't have.  I believe that they believe what I believe are

22   faith and God.  That if you don't walk with God, it's a door

23   open for the enemy, the devil to just tempt you to put

24   anything in your mind.  And sometime we may not be able to

25   explain why we did things even though it was wrong.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

1     And perhaps they know about it, if they read Romans,
2 Chapter 7 where it talks about your battle with sin. And the
3 author is Paul and he tells you that sometime we act the way
4 we act and not because of we want to do it, but it's because
5 that power in us. In other words, he talks about, in other
6 words, the monster that Cecilia mentioned. It was another
7 part of me that it wasn't me, but it was in me.
8     It's hard to explain this. It's hard for me to
9 explain, but I know that I got tired of serving the enemy,
10 serving the devil. And then one day I just got tired and I
11 got down onto my knees and accepted Jesus Christ, my Lord and
12 savior. And from that point on I became a knew creation.
13 What I did in the past is in the past. And, yes, it's not an
14 excuse that is beyond me.
15     Just as they have been scarred, I will also be
16 scarred. And I am not making excuses for that. I will have
17 to live for the rest of my life for what I have done to these
18 people, for the pain that I have caused them, the harm.
19     But I just want them to know that that wasn't
20 Ricardo, the one that ran, the one that was in ROTC, the one
21 that was involved in helping others. It was a time of
22 desperation where I didn't want to reach for help. That I
23 want to be a prideful person, a man that doesn't need any help
24 from anyone. And that it took over me and it took decisions
25 that I wouldn't even imagine and think about it.

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    But I thank my God that I have found the salvation.

2 As I've been incarcerated for a year and a month, I don't see

3 as a terrible thing.  I have found jail as a salvation place

4 where I was so busy outside worrying about what Mama need, how

5 the roof of the house had a hole and she was getting wet and

6 my brother was getting wet and they needed money for them to

7 eat.  My brother for go to school.  I wasn't worrying about

8 Grandma may need something, my brother may need something.

9 How I'm going to make the next payment for my car, my cell

10 phone.  All those things were incarcerating me even as I was

11 outside these walls that I am now.  But now that I have a time

12 where I can think and recognize things and think things

13 through, that I can think before I act, that I can think

14 before I speak.  And I only find that through incarceration.

15    And yes, I hope that I wouldn't have to step into

16 this decision and be in here in front of this court and

17 speaking to you.  But the reality is that I made those bad

18 decision and I'm not making excuses, Your Honor.  I'm willing

19 to pay the consequence.

20    But I just want to say to the Lord that I am not

21 that person did those -- did that action that took place.  I'm

22 a different person, and I'm sure a different person now with a

23 different belief.

24    The three women that spoke about faith, that's what

25 I stand for as well.  He knows my heart.  He knows really who

I am. And I'm here standing because of him. I was able to
wake up this morning, Your Honor, because of him. Because by
his grace and because by his mercy, we're all falling off the
shore of the glory of God, Your Honor. We all make mistakes.
Some worse. Some small. But in the eyes of God, even if you
steal from a bank or even if you go to Walmart and steal
candy, that's stealing. Even if you're driving in a car and
somebody gets in front of you and you just say something
hatred against that person, that's killing even though you
don't physically get a gun or even if you don't physically get
a knife and stab that person. In God's eyes that's killing.

The whole point, Your Honor, I'm not making excuses
for me. The whole point is that we all have (inaudible) of
doing the right thing, but I'm not what I used to be. I'm a
new creation of God and I believe in the same faith that these
ladies believe in. I hope and pray, Your Honor, that every
single person in here in this court, Cecilia, my family,
everyone in here present, that I hope and pray that they will
not have to go through something, perhaps sickness or some
other loved ones be lost or something happen to them that they
can't understand, for them to turn to God and hope and pray
that everyone will find the salvation.

Because, Your Honor, every day that as I hear things
on TV on news, there's earthquakes going on everywhere in the
world. And it tells you in the books about Matthew and John

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   and all the evangelists and all the gospel of God that, you
2   know, that war is going to happen, the earthquakes, big
3   earthquakes are going to happen all over before the son of God
4   appears.  And you know, no one knows -- it tells you in the
5   word that no one knows when the Lord will return.  You know,
6   but I hope and pray that more and more souls will be saved
7   every day, that they will accept Jesus Christ, their holy
8   savior.
9           As for my bad decision, God have turned into a good
10  decision.  I have found my salvation, Your Honor.
11          I just thank you for this time.  And I want to
12  apologize to the victims.  I can't imagine what you guys went
13  through that night, those days.  I wish that I can say more.
14  But I ask God that he would bless you guys and continue to
15  bless you with your faith in God and be happy in your life and
16  you continue to trust in him.
17          I want to apologize to my family as well for the
18  pain that I've caused you guys.  The scar that not just I've
19  left on the victims but my family as well.  They say they
20  don't recognize the person that the prosecutor speaks about or
21  the person that the ladies have spoke about, Your Honor.  This
22  is somebody else different.  Not because they're my family,
23  but because they seen my actions and know who I was.
24          I just want to thank you for this time, Your Honor,
25  and I pray and hope that everyone will find salvation.  I

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  thank you, Your Honor, for this time.

2          THE COURT:  Thank you.

3          Mr. Arellano, I need you to stand for sentencing at

4  this time.

5          Pursuant to the Sentencing Reform Act of 1984 and

6  the case of *United States versus Booker*, it is the judgment of

7  this court, having considered the factors noted in 18, U.S.C.,

8  Section 3553(a), that the defendant, Ricardo Javier Arellano,

9  is hereby committed to the custody of the Bureau of Prisons to

10 be imprisoned as follows:

11         As to count six, for a term of 108 months.

12         As to count nine, for a term of 108 months, to be

13 served concurrently with the sentence as to count six.

14         As to count three, for a term of 300 months.

15         And as to count two, for a term of 300 months.

16         With the terms for counts two and three to be served

17 concurrently with one another but consecutive to the sentence

18 for counts six and nine, for a total term of incarceration of

19 408 months.

20         As to how I have applied the sentencing factors in

21 arriving upon the sentence, they are as follows:

22         First, I have made the determination that because of

23 the nature of the crime that is charged and admitted in counts

24 two and three, that they warrant being treated separately from

25 the other counts.  Therefore, with regard to counts six and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    nine, I did a recalculation as to what the guidelines range

2    would have been for treating those two counts, six and nine,

3    separately, and determined that the guideline range would have

4    been 87 to 108 months.

5         And as to the offense conduct set out in charges six

6    and nine, considering the seriousness of the offense,

7    particularly the manner in which those offenses were committed

8    with the binding of the victims and the other offense conduct

9    as set out, that a sentence at the top end of the guideline

10   range was warranted and was needed to promote respect for the

11   law, to afford deterrence to criminal conduct, and to provide

12   just punishment for that crime and the nature in which that

13   crime was committed.

14        Then as to counts two and three, it was my

15   determination that there were many factors in the manner in

16   which those crimes were committed that warrant an upward

17   variance in the sentence above the guideline range.  And even

18   though as to count three, it takes into account the abduction

19   of a victim, much more occurred here than the simple abduction

20   of the victim.

21        The guidelines do not take into account such things

22   as the fact that there was a home invasion at a quarter to

23   6:00 in the morning, a place and a time when people expect to

24   be safe.

25        It does not take into account the fact that there

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  was a carjacking.

2          It does not take into account that there was a

3  threat of violence against the victim's children.

4          It doesn't take into account the fact that the

5  defendant kidnapped the victim's children.

6          It does not take into account the fact that the

7  defendant transported the victim while the children were still

8  being held and still being bound and still under the fact that

9  they were being told that they were being watched by someone.

10         Frankly, it doesn't take into account the fact that

11  this crime was committed, in part, by the defendant committing

12  child abuse.

13         It doesn't take into account that this crime was

14  committed with the defendant using the defendant's extensive

15  knowledge of the victim and the victim's family in order to

16  perpetrate the crime.

17         It doesn't take into account the mental anguish that

18  this defendant perpetrated upon the victim and the victim's

19  children.

20         Now, as to count three, the statutory range for a

21  sentence is a minimum of ten years and a maximum of life.  And

22  it is hard to imagine a set of circumstances that did not

23  constitute yet other crimes in violation of the statute set

24  out in counts two and three that would be worse than what I

25  see in the offense conduct here.  And therefore, the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

seriousness of this offense cries out for counts two and three being punished separately from counts six and nine and being punished at the level of a 300 month sentence.

I believe that the harsh sentence that I have imposed here is necessary and not any longer than is necessary to fulfill the statutory requirements under 3553(a).

This sentence is necessary to promote respect for the law.

I certainly don't encourage anyone to rob a bank, but I need to send the message that if you're going to rob a bank, you sure better not do it like this. I have to afford deterrence of criminal conduct not just for this defendant, but for others. And if there is anybody out there who is contemplating this sort of action, I hope that this sentence deters them.

I believe that this sentence provides just punishment for the defendant, and I believe that this sentence also protects the public from further crimes of the defendant.

Mr. Arellano, I hear that you say that you are a changed man. I hope and pray you're right. You have some hard times ahead of you. But based on the conduct that I've seen in the past, I can't bank on that and I have to protect the public from who you've shown you were in the past, and that's what I believe that this sentence does.

Upon release from imprisonment, the defendant shall

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    be placed on supervised release for a term of three years.
2    This shall consist of a term of three years as to counts two,
3    three, six, and nine, and all of those terms shall run
4    concurrently.

5            Within 72 hours of release from the custody of the
6    Bureau of Prisons, the defendant shall report in person to the
7    probation office in the district to which the defendant is
8    released.

9            While on supervised release, the defendant shall not
10   commit another state, federal or local crime, and shall comply
11   with the standard conditions that have been adopted by the
12   court in the Western District of North Carolina.

13           It is further ordered that the defendant shall pay
14   the United States a special assessment in the amount of $400.

15           It is further ordered, having determined the amount
16   of restitution owed to each victim, that the defendant shall
17   make restitution as directed to the following victims in the
18   following amounts.

19           First Citizens Bank, $25,374; Julie Baker, $1,256;
20   Shelby Baker, in care of Julie Baker, $89; Monique
21   Howard-McLeod, $525; Truliant Federal Credit Union, $10,000;
22   CUNA Mutual Group, $12,223.59, for a total restitution award
23   of $49,467.59.

24           Any payment that is not payment in full shall be
25   divided proportionately among the victims named -- strike

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

1   that.

2           Any payment that is not payment in full shall be

3   distributed first proportionately to victims Julie Baker,

4   Shelby Baker, and Monique Howard-McLeod.  After victims Julie

5   Baker, Shelby Baker, and Monique Howard-McLeod are reimbursed

6   in full, then any further payment that is not payment in full

7   shall be divided proportionately among the remaining victims

8   named.

9           The defendant is jointly and severally liable with

10  Johnny Enrique Arroba, his co-defendant in this matter.

11          The court gives notice that this case may involve

12  other defendants who may be held jointly and severally liable

13  for payment of all or part of the restitution ordered herein

14  and may order such payment in the future.

15          It is further ordered that the victims' recovery is

16  limited to the amount of their loss and the defendant's

17  liability for restitution ceases if and when the victims

18  receive full restitution.

19          The court finds that the defendant does not have the

20  ability to pay a fine or interest.  The court considers the

21  factors noted in 18, U.S.C., Section 3572(a) and will waive

22  the payment of a fine and interest in this case.

23          It is further ordered, having considered the factors

24  noted in 18, U.S.C., Section 3572(a), that the defendant shall

25  reimburse the United States for court-appointed attorney's

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  fees.

2          Payment of the criminal monetary penalties shall be

3  due and payable immediately.  The court has considered the

4  financial and other information contained in the presentence

5  report and finds that the following is feasible:

6          If the defendant is unable to pay any monetary

7  penalty immediately, during the period of imprisonment

8  payments shall be made through the federal Bureau of Prisons

9  Inmate Financial Responsibility Program.

10          Upon release from imprisonment any remaining balance

11  shall be paid in monthly installments of no less than $50 to

12  commence within 60 days after release from imprisonment until

13  paid in full.

14          Throughout the period of supervision, the probation

15  officer shall monitor the defendant's economic circumstances

16  and shall report to the court with recommendations as

17  warranted any material changes that affect the defendant's

18  ability to pay any court-ordered penalties.

19          One thing that I believe I forgot to include with

20  regard to the recommendations to the Bureau of Prisons, it is

21  recommended that the defendant be allowed to participate in

22  any educational and vocational opportunities during the period

23  of incarceration.

24          Are there any other matters concerning either the

25  judgment or the sentence that need to be addressed?

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    Ms. Oseguera?

2        MS. OSEGUERA:  Judge, Your Honor, at this time, for

3    the record, I would like to object to the sentence based on

4    any applicable Sixth Amendment grounds, any applicable Eighth

5    Amendment grounds.  I'd also like to object to the sentence

6    based on any type of lack of variance or departure for

7    variance.  And those are just for the record, Your Honor.

8        THE COURT:  Okay.  As to the Sixth Amendment or

9    Eighth Amendment grounds, when you say any applicable, are

10   there any that you are advocating to this court?

11       MS. OSEGUERA:  Well, Your Honor, as far as Eighth

12   Amendment grounds, Your Honor, the sentence is cruel and

13   unusual punishment for this type of offense, although very --

14   the word I want to use is not a good offense, it's a bad

15   offense.  It's definitely cruel and unusual punishment.

16       And again, the upward departure, Your Honor, for

17   Sixth Amendment grounds is basically just a high sentence,

18   Your Honor.  So I would just like to note that for the record.

19       And then, again, any failure to provide notice for

20   the upward departure and the upward variance.

21       THE COURT:  Okay.  And I want to make sure that the

22   record is clear.  I have not made an upward departure.  I've

23   made an upward variance.  And if at some point I somehow

24   misspoke and referred to an upward departure, I want to make

25   sure that the record is clear that that is not what I have

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1    done.

2         Any other issues that we need to address regarding

3    either the judgment or the sentence?

4         MS. OSEGUERA:  No, Your Honor.

5         THE COURT:  Mr. O'Malley?

6         MR. O'MALLEY:  No, Your Honor.

7         THE COURT:  Mr. Arellano, you have the right to

8    appeal this sentence to the Fourth Circuit Court of Appeals on

9    any grounds that you have not previously waived.  Now, you are

10   pleading -- you have pled guilty pursuant to a plea agreement

11   and that plea agreement contains some waivers that may have a

12   substantial effect on your appeal rights and you will need to

13   talk to your attorney about what effect that may have.  If you

14   choose to appeal, you must file a written notice of appeal

15   with the clerk of this court within a period of 14 calendar

16   days following the date of the entry of the final written

17   judgment in this case.  If you choose to appeal but do not

18   have the funds with which to appeal, you have previously been

19   determined to be indigent and therefore you may appeal at

20   government expense.

21        Do you understand this right of appeal as I have

22   just explained it to you?

23        THE DEFENDANT:  Yes, sir.

24        THE COURT:  Ms. Oseguera, with regard to the court's

25   standing order for members of the Federal Defender's Office to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

1  file the information equivalent to the CJA20, I'm going to

2  enter an order that that be filed within ten days of this

3  hearing.

4          MS. OSEGUERA:  I will do that, Your Honor.

5          THE COURT:  Mr. O'Malley, does the government have a

6  motion with regard to any remaining counts?

7          MR. O'MALLEY:  Yes, Your Honor.  Pursuant to the

8  plea agreement, we would dismiss any remaining counts against

9  this defendant as set forth in the superseding bill of

10  information -- bill of indictment.

11          THE COURT:  And with the remaining counts in the

12  superseding bill of indictment, those being counts one, four,

13  five, seven, eight, and ten, based on the government's motion,

14  those are hereby dismissed as to this defendant.

15          Are there any other matters that we need to address?

16          MS. OSEGUERA:  No, Your Honor, for the defendant.

17          MR. O'MALLEY:  No, Your Honor.

18          THE COURT:  The defendant, then, is remanded to the

19  custody of the marshal.

20          Mr. Arellano, I wish you the best.

21          THE DEFENDANT:  Thank you, Your Honor.

22          THE COURT:  I've heard a lot of what you've had to

23  say in your allocution.  You are a very eloquent man.  I

24  really hope that all of what you said sticks.

25          THE DEFENDANT:  Yes, sir.  Thank you.

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

1           THE COURT:  Thank you.

2           (End of proceedings at 12:11 p.m.)

3                        *****

4  UNITED STATES DISTRICT COURT

5  WESTERN DISTRICT OF NORTH CAROLINA

6  CERTIFICATE OF REPORTER

7

8

9           I certify that the foregoing transcript is a true

10 and correct transcript from the record of proceedings in the

11 above-entitled matter.

12

13          Dated this 16th day of June, 2010.

14

15

16                          s/Cheryl A. Nuccio
                            Cheryl A. Nuccio, RMR-CRR
17                          Official Court Reporter

18

19

20

21

22

23

24

25

           Cheryl A. Nuccio, RMR-CRR (704)350-7494